## PROPERTY SUB-MANAGEMENT AGREEMENT

THIS AGREEMENT is made and entered into this _____ day of June, 2018 by and between DSM Group, Inc. (hereinafter referred to as the "Manager") and Borror Properties Management, LLC, (hereinafter referred to as "Borror") and ORO Oro Karric North, LLC ("Owner").

### RECITALS:

WHEREAS, Owner has contracted to purchase that certain real property located at 3970 Brelsford Lane, Dublin, Ohio 43016 (hereinafter the "Property" or "Project"). In connection therewith, upon closing with will retain Manager as its property manager under a separate Property Management Agreement ("Prime Management Agreement").

WHEREAS, Manager desires to retain Borror on an exclusive basis on the terms and conditions herein during the term of this Agreement, and Borror desires to accept such responsibilities and duties set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Manager and Borror agree as follows:

## SECTION 1
## APPOINTMENT OF MANAGING AGENT

1.1   APPOINTMENT AND ACCEPTANCE: Manager hereby engages Borror as its sole and exclusive property manager to lease and manage the Property described in Section 1.2 upon the terms and conditions provided herein. Borror accepts the engagement and agrees to furnish the services of its organization in accordance with the terms and provisions contained herein.

1.2   Intentionally Deleted.

1.3   TERM: The initial term of this Agreement shall be for a period of approximately five (5) years (the "Initial Term") commencing on the closing of the purchase of the Property to the _____ day of June, 2023. This Agreement shall be automatically renewed for successive periods of one (1) year, unless this Agreement is terminated as provided in Section 18 herein.

1.4   MANAGEMENT OFFICE: Manager shall provide adequate space on the Project for a management office, exclusively for the use of Borror to conduct the business of the management of the Project. Manager shall pay all reasonable expenses related to such office as provided in the Plan (defined below), including, but not limited to, furnishings, equipment, postage, office supplies, electricity, other utilities, and telephone services.

1.5   APARTMENT FOR ON-SITE STAFF: Manager shall provide suitable apartment unit(s) within the Project for the use of the resident manager and such assistant managers or maintenance personnel as Borror and Manager may deem reasonable under the circumstances and

as provided in the Plan. Borror, with the approval of Manager, shall be entitled to provide such on-site staff (employees) with such rental concessions (reductions in rent) as Borror and the Manager may deem necessary and appropriate under the circumstances.

      1.6    BUDGET AND BUSINESS PLAN: Manager and Borror will establish an annual budget and business plan for operation and management of the Project (the "Plan"). The Plan shall act as a general guide for the management of the Project by Borror and shall be updated and revised one time per year as mutually agreed to by Manager and Borror to reflect changes in conditions and actual Project operation. Any significant expenditure not specifically set forth in the Plan shall require Manager's written advance approval, except as provided in Section 4.2 hereof. Manager agrees that the Plan is a budgeting tool only and does not constitute a guarantee of actual operating performance. The Plan shall include, at a minimum, the following:

      A.    Revenue Threshold: The Plan shall contain a minimum adjusted cashflow threshold for each fiscal period (as established by the Plan) (the "Revenue Threshold") to be achieved by Borror during the Term of this Agreement.

      B.    Minimum Leasing Guidelines: Guidelines established jointly by Manager and Borror, setting forth target rental rates and premiums for each unit type and amenity package, together with maximum leasing incentive allowances for promotional purposes. If Borror executes any lease (or any renewal or extension thereof) on terms which vary from the minimum leasing guidelines, Borror will obtain Manager's prior written approval.

      C.    Capital Improvement Plan: Manager and Borror have set forth a plan for implementing initial capital improvements to upgrade the rental units and correct maintenance items addressed during Manager and Borror's pre-acquisition inspection of the Property (if applicable). Should the capital plan fall within industry standards for normal property management duties, Borror shall be responsible for obtaining bids, coordinating and scheduling the work at the Property. A minimum of three (3) bids will be obtained for each Improvement Plan item of more than $25,000.

SECTION 2<br>BANK ACCOUNTS

      2.1    BANK ACCOUNTS: Other than a petty cash account agreed upon by the parties, Borror shall not have any bank accounts on behalf of Manager. All security deposits/rents/monies regarding the Property shall be forwarded to Manager and shall be maintained by Manager in Manager's bank account. Manager shall hold these funds separate from other corporate funds and in the name of Owner. Manager is responsible to handle all monies of the Property. Manager is responsible to pay all bills/invoices of the Property. If Manager fails to pay bills/invoices of the Property, then Borror shall be excused from performing the services or any other duties under this Agreement to the extent of such failure.

      2.2    INITIAL DEPOSIT TO TRUST ACCOUNTS: Immediately upon commencement

of this Agreement, Manager shall fully fund all required tenant security deposit trust account. Manager shall hold these funds separate from other corporate funds and in the name of Owner for aforementioned use. If state law allows, and Manager elects to not fully fund tenant trust accounts, Owner and/or Manager agrees to indemnify and hold Borror harmless from any claims that may result from such an election and agrees to sign a security deposit waiver addendum, if required by state law.

2.3     BORROR'S OBLIGATION TO ADVANCE PAYMENTS: All purchases and other obligations incurred in connection with the operation of the Project shall be the sole cost and expense of Owner and/or Manager. All such purchases shall be made by Borror solely on behalf of Owner or Manager and not as a principal. Borror shall be under no duty to utilize or apply Borror's own funds for the payment of any such debt or obligation. Borror shall not be obligated to make any advance to or for the operating account, nor shall Borror be obligated to incur any liability or obligation for the account of Owner without assurance that necessary funds for the discharge thereof have been provided.

## SECTION 3
## COLLECTION OF RENTS AND OTHER RECEIPTS

3.1     AUTHORITY OF BORROR: Borror shall collect (and give receipts for, if necessary) all rents, charges and other amounts received in connection with the management and operation of the Project. All security deposits (excluding non-reimbursable cleaning fees and the like) shall be forwarded to Manager. All other receipts shall be deposited into the operating account. Under no circumstances shall Borror be liable to Manager for any uncollected rents, other income or bad debt resulting from operations.

3.2     SPECIAL CHARGES: Borror shall deposit into the operating account charges paid by tenants for the late payment of rent, returned or non-negotiable checks, and other similar payments.

## SECTION 4
## DISBURSEMENT FROM OPERATING ACCOUNTS

4.1     OPERATING EXPENSES: Owner and/or Manager have sole responsibility for the timely payment of all authorized expenses of the Project. Borror shall not be responsible for the payment of late fees or penalties. Manager shall reimburse Borror for those fees set forth on Exhibit A to this Agreement and compensate Borror in accordance with Section 15 hereof.

4.2     EXTRAORDINARY EXPENSES: Unless specifically provided for in the Plan, no single expenditure made for general maintenance or one-time contract service in excess of $10,000.00 shall be allowable without prior approval of Manager. Manager may request written bids for any expenditure over $15,000.00. Borror is required to submit a minimum of three (3) written bids for all expenditures over $15,000. However, in the event of an emergency, owner authorizes Borror to authorize any reasonable expenditure which is necessary or required because of danger to life or property, or which is immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or if required to avoid the

suspension of any necessary service to the Project, or to comply with any applicable federal, state, or local laws, regulations, or ordinances. Borror shall, however, as soon as reasonably possible, notify Manager in detail, concerning such expenditures.

4.3 AUTHORITY OF OWNER FOR BORROR TO PAY CERTAIN EXPENSES: Manager shall pay in accordance with the business plan, all utility and maintenance charges; all real property taxes and assessments; all premiums for liability and casualty insurance; all monthly payments upon underlying secured real property debt; Borror's fees; all other operating and rental expenses set forth herein; postage, copying, long distance charges and other expenses that are directly associated with the property (whether incurred on-site or otherwise); the costs and expense of uniforms for employees (where applicable) and the costs and expenses directly associated with the training of Project employees and reasonable expenses for employee retention events.

4.4 FEES FOR LEGAL ADVICE: Manager shall pay reasonable expenses incurred by Borror in obtaining legal advice regarding compliance with any law affecting the Project, including the defense of vendor suits or other claims made against the Project or Borror relating to its activities as Agent for Manager, or activities related to the operation of the Project. Borror shall notify the Manager if legal services are anticipated to exceed the amounts set forth in the Plan. If any expenditure for legal services also benefits others for whom Borror acts as a property manager, Manager's obligation shall be limited to Manager's pro rata portion of such expense for legal services. Provided, however, that nothing contained in this section shall obligate Manager to pay Borror's legal fees in the event Borror is adjudged to have engaged in fraud or misconduct relating to the allegations of the dispute. Notwithstanding anything contained herein to the contrary, Borror shall not be liable for any action that Borror takes in good faith in reliance on the reasonable advice from legal counsel.

4.5 PRIORITY OF PAYMENT: Should collected funds (excluding security deposits deposited into trust accounts) be insufficient to satisfy the current debts and obligations of the Project, such debts and obligations shall be paid in the following order: Project payroll, including all related administrative charges and expenses; management fees and related expenses due Borror; charges by utility companies (including, but not limited to, gas electric, water, sewer, garbage and cable television); other Project expenses; underlying secured real property debt; other required payments, including payments to reserve accounts. Where the terms of any loan security agreement with Owner conflict with the terms of this section, the terms of such loan security agreement shall control, provided, the Owner has notified Agent of the existence of any such condition.

SECTION 5
FINANCIAL AND OTHER REPORTS

5.1 REPORTS: Borror shall, on a mutually acceptable schedule and at Manager's request, prepare and submit to Manager such reports as Manager shall specify, including, but not limited to the following:

      a.) Weekly occupancy, leasing status and traffic reports.

  b.)  Monthly market comparable rent survey.

## SECTION 6
## ADVERTISING

  6.1  ADVERTISING: Borror is authorized to advertise the Project and vacant units within the Project for rent and employment, using periodicals, signs, plans, brochures or displays, or such other means as Borror may deem proper and advisable. Borror is authorized to place signs on the Project advertising that units are available for rent, provided such signs comply with applicable laws. The cost of such advertising as approved by Manager, shall be paid by Manager. All advertising shall make clear that Borror is the manager and is not the Owner of the Project. Borror shall have the right to publish advertisements that share space with other properties managed by Borror. Provided, that the costs of such advertising shall be prorated among the various projects.

## SECTION 7
## LEASING AND RENTING

  7.1  BORROR'S AUTHORITY TO LEASE PROJECT: Borror shall use its best efforts to keep the Project rented by procuring tenants for the Project. Borror is authorized to negotiate, prepare and execute all rental agreements, including all renewals and extensions of rental agreements on such forms as have been approved in writing by Manager, and to cancel and modify existing rental agreements subject to the Plan. Borror shall execute all rental agreements as agent for the Manager. All costs of leasing shall be paid out of the operating account, in accordance with the leasing budget or as approved by Manager. No rental agreement shall be for a period in excess of one (1) year without the approval of Manager. The form of the rental agreement shall be agreed upon by Manager and Borror and be acceptable to the lender for the Project.

  7.2  NO OTHER RENTAL AGENT: During the term of this Agreement, Manager shall not authorize any other person, firm or corporation to negotiate or act as leasing or rental agent with respect to any leases for commercial or residential space in the Project. Manager agrees to promptly forward all inquiries about leases or rental agreements to Borror.

  7.3  RENTAL RATES: In accordance with the provisions of the Plan or as otherwise directed by Manager, Borror may establish and set or revise all rents, fees or other deposits, and all other charges chargeable with respect to the Project. Borror shall be authorized to promote the occupancy of the Project by granting rental concessions and other promotional bonuses to prospective and current tenants, after first consulting with Manager as to the nature, quantity and duration of such rental concessions and promotional bonuses and obtaining written consent.

  7.4  ENFORCEMENT OF RENTAL AGREEMENTS: Borror is authorized to institute and defend, in Owner's and Manager's name(s) or in the name of Borror, all legal actions or proceedings for the enforcement of any rental term, for the collection of rent or other income due to the Project, or for the eviction or dispossession of tenants or other persons from the Project and matters relating thereto. Borror is authorized to sign and serve such notices as Borror and Manager deem necessary for the enforcement of rental agreements, including the collection of rent and other

income. Borror may settle, compromise and release such legal actions or suits or to reinstate such tenancies without the prior consent of Manager, if such settlement, compromise, or release shall involve an amount in controversy of Two Thousand Dollars ($2,000), or less. Where the amount in controversy is in excess of Two Thousand Dollars ($2,000), Borror shall first obtain the written authorization of Manager before entering into any compromise, settlement, or release of such legal action. Any moneys for such settlements paid out by Borror shall be an operating expense of the Project. Reasonable attorney's fees, filing fees, court costs and other necessary expenditures incurred in the connection with such action shall be paid out of the Project operating account or shall be reimbursed directly to Borror by Manager. All funds recovered by tenants shall be delivered to Manager. Unless otherwise directed by Manager, Borror may select the attorney or attorneys to handle any and all such litigation. Absent a finding of gross negligence or misconduct by Borror employees, Owner and/or Manager shall be responsible for all claims, damages and legal expenses relating to the lease or other housing statutes, whether brought against the Owner, Manager or Borror as the agent of Manager.

## SECTION 8
## PROJECT EMPLOYEES

8.1 BORROR'S AUTHORITY TO HIRE: Borror, and not Owner or Manager, is responsible for hiring, supervising, discharging and paying all servants, employees, contractors or other personnel necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the Plan guidelines. All employees performing services directly for the Project (excluding off-site property manager) shall be deemed to be employees of Borror and the Project. Borror is an equal opportunity employer.

8.2 MANAGER TO REIMBURSE EMPLOYEE EXPENSES: All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, employees of the Project (but not to property managers not employed directly by the Project) and all local, state and federal taxes and assessments (including, but not limited to, payments to and administration of fringe benefits, employee benefits insurance program, Worker's Compensation, Social Security taxes and Unemployment Insurance) incident to the employment of all such personnel and their direct training, shall be treated as an operating expense of the Project and shall be paid by Borror from Manager's funds, from the Project operating account subject to the Plan. In addition, Borror shall accrue for all vacation pay due site employees and provide a quarterly reconciliation to Manager of all such payments. Such payments shall also include all awards of back pay and overtime compensation that may be awarded to any project employee in any legal proceeding, or in settlement of any action or claim that has been asserted by any such employee. Manager shall pre-pay Project payroll thirty days in advance and authorizes Borror to maintain a credit for thirty days of estimated Project payroll and one months of estimated management fees for the term of this Agreement.

8.3 BORROR'S AUTHORITY TO FILE RETURNS: Borror shall do and perform all acts required of an employer with respect to the Project and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or ordinances governing employment, and all other statements and reports pertaining to labor employed in

connection with the Project and under any similar federal or state law now or hereafter in force. The costs for any preparing such filings shall be a Project expense. In connection with such filings, Manager shall, upon request, promptly execute and deliver to Borror all necessary powers of attorney, notices of appointment and the like. Manager shall be responsible for all amounts required to be paid under the foregoing laws, and Borror shall pay the same from the operating account.

8.4     WORKER'S COMPENSATION INSURANCE/TAXES: Borror shall, at Manager's expense, maintain and administer a Worker's Compensation Insurance program covering all liability of Borror and the Project under established worker's compensation laws and all other Federal and State labor laws, whether such laws provide that such insurance shall be obtained from a third-party carrier or from a state fund and whether such payments shall be denominated as insurance premiums or taxes. Borror's employees are covered by a national insurance program (except in selected states) for which Borror pays a single premium. Individual properties are assessed their prorated portion of Borror's total worker's compensation premium based on the number of employees at each Project. The total of the premium may be less than the gross amount collected from all Borror properties.

8.5     LIMITATION ON BORROR'S LIABILITY. Borror may consult with legal counsel, accountants and other consultants selected by it.   Borror shall not be responsible for the misconduct, negligence, acts, or omissions of any Consultant or independent contractor retained by Borror with respect to the Project and shall assume no obligation concerning such consultants or independent contractors other than to use due care in selecting them.

8.6     REIMBURSEMENTS FOR CLAIMS. Manager shall reimburse Borror for payments made by Borror to any Project employee, where the Project employee claims, for whatever reason, previously unpaid wages, including but not limited to, overtime compensation, fringe benefits, and other forms of compensation, which are held to be payable to the Project employee by any court, arbitrator or administrative agency having jurisdiction over the matter, or by reason of any settlement made by Borror but excluding any penalties if Manager has paid the original invoice for such labor. This reimbursement shall not be applicable where such claims are caused by the gross negligence or willful misconduct of Borror.

SECTION 9
OPERATIONS, MAINTENANCE AND REPAIR

9.1     PERFORMANCE OF REPAIRS: Borror is authorized to make or cause to be made, through Project employees, Borror's employees, or through contracted services, all ordinary repairs and replacements reasonably necessary to preserve the Project in its present condition and for the operating efficiency of the Project, and all alterations required to comply with rental agreement requirements, government regulations or insurance requirements. In accordance with the Plan or as otherwise directed by Manager, Borror is also authorized to decorate the Project and the individual apartment units and to purchase or rent, on Manager's behalf, all equipment, tools, appliances, materials, supplies, uniforms and other items necessary for the management, maintenance or operation of the Project. Such maintenance and decorating expenses shall be paid by Manager. Borror has national contracts with certain vendors to provide goods and services to

projects such as the one covered by this Agreement. Borror selects these national vendors in order to receive volume-pricing discounts for the benefit of the Manager. If Manager selects a vendor for use on the Project, Manager shall indemnify and hold Borror harmless from any and all damages that arise from the use of such vendor.

9.2   FEES FOR WORK PERFORMED BY BORROR'S EMPLOYEES: With Manager's prior approval, Borror may cause repairs and replacement work to be performed by employees for Borror who are not otherwise direct employees of the Project. Manager shall pay to Borror a reasonable fee for such services based upon the then current hourly charges made and assessed by Borror for the performance of such services. Such charges shall be approximately equal to Borror's direct and indirect expenses associated with the employment of such person. Such charges shall be reasonable and shall not be more than charges made by qualified independent contractors performing similar work, under similar circumstances, in the same geographical area as the Project.

9.3   CONTRACTS, UTILITIES AND SERVICES: Borror is authorized to negotiate contracts for non-recurring items of expense, not to exceed $5,000.00. Borror shall enter into agreements for all necessary repairs, maintenance, minor alterations, and utility services, and make contracts on Manager's behalf for electricity, gas, telephone, fuel, water and such other services required for the operation of the Project, in accordance with the Plan. All utility deposits shall be the Manager's responsibility, except that Borror may pay the same from the operating accounts if directed to do so.

9.4   LIMITATIONS ON CONTRACTS: Each such contract or agreement shall: (a) be in the name of the Project, (b) include a provision of cancellation thereof by Manager or Borror upon not more than thirty (30) days written notice (if available), and (c) shall require that all contractors provide evidence of sufficient insurance. If this agreement is terminated pursuant to Section 18, Borror shall, at Manager's option, assign to Manager or Manager's nominee all contracts and agreements pertaining to the Project. Borror shall then notify Manager if any such contracting entity is either a subsidiary, affiliate, or has any other relationship whatsoever to Borror.

## SECTION 10
## RELATIONSHIP OF BORROR TO OWNER AND MANAGER

10.1   Borror is engaged independently in the business of property management and acts hereunder as an independent contractor. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Borror to bear any portion of losses arising out of or connected with the ship or operation of the Project. Borror does not warrant the financial performance of the Project. Borror shall not, at any time during the term of this Agreement, be considered to be a direct or indirect employee of Manager. Manager agrees to assume all financial risks of operating the project including any claims made against Borror while acting as Manager's Agent within the scope of its authority as provided herein. Manager agrees to hold Borror harmless for any and all claims arising prior to Borror's management of the Project. Except as provided herein, neither party shall have the power to bind or obligate the other party. Except as specifically set forth in

this Agreement, Borror shall not act as the agent of Manager; and, except as provided in this Agreement, Manager shall not act as the principal of Borror.

## SECTION 11
## INDEMNIFICATION

11.1 **INDEMNIFICATION BY OWNER AND MANAGER.** Owner and Manager agrees to indemnify, defend, protect, and hold harmless Borror and its affiliates, agents and employees, from (i) any action arising from the Project, (ii) any loss, cost, liability, or expense (including without limitation reasonable attorneys' fees) incurred in defense of any claim, action or proceeding arising out of or in connection with this Agreement, (iii) Borror's performance of its obligations hereunder, or otherwise in conjunction with the Project; or (iv) any errors or prior actions taken by Owner and/or Manager and Owner and/or Manager's agents with respect to any tenant security deposits that may have been collected by Owner and/or Manager or Owner and/or Manager's agents prior to the effective date of this Agreement. Borror shall promptly notify Owner and/or Manager in writing of any such claim, action or proceeding which may give rise to liability under this section and shall cooperate fully in connection with Owner and/or Manager's defense, negotiation or settlement thereof. Notwithstanding the foregoing, Owner and Manager shall not be required to indemnify, defend or hold Borror harmless against any loss, cost, liability or expense to the extent it arises as a result of the gross negligence or willful misconduct on the part of Borror, its affiliates, agents or employees.

11.2 **INDEMNIFICATION BY BORROR.** Borror agrees to indemnify, defend, protect and hold harmless Owner or Manager, its agents and employees from any loss, cost, liability or expense (including without limitation reasonable attorneys' fees) incurred in defense of any claim, action, or proceeding maintained against Owner and/or Manager (i) due to and to the extent of the gross negligence or willful misconduct on the part of Borror, its affiliates, agents and employees or (ii) arising out of the alleged or actual violation by Borror of labor, employment or discrimination laws; provided, however, this indemnity shall not be applicable if Owner and/or Manager has not furnished Borror with sufficient funds to perform Borror's obligations under this Agreement. Notwithstanding the foregoing, Borror shall not be required to indemnify, defend or hold Owner and/or Manager harmless against any loss, cost, liability or expense that to the extent it arises as a result of Owner and/or Manager's breach or default under the agreement or any act, including negligence, on the part of Owner and/or Manager, its agents or employees.

11.3 **WAIVER OF CLAIMS**: Owner and Manager hereby waive any and all claims against Borror, including Borror's employees, agents, general partners and affiliates, for damage or injury to any property in, upon, or about the Project, including but not limited to, the premises of the Project, whether caused by peril, accident, theft or from any other cause whatsoever, other than to the extent caused by the gross negligence or willful misconduct of Borror, its agents and employees.

11.4 **HAZARDOUS MATERIAL:** Owner and/or Manager represents that it has no knowledge of Hazardous Material or conditions at the Project except as Owner and/or Manager has informed Borror in writing and attached to this Agreement. Owner and Manager shall defend, indemnify and hold harmless Borror from and against any and all losses, liabilities, damages,

injuries, costs, expenses and claims of any and every kind whatsoever (including, without limitation, court costs and reasonable attorneys' fees) which at any time or from time to time may be paid, incurred or suffered by, or asserted against, Borror for, with respect to, or as a direct or indirect result of, the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from, the Project into or upon any land, the atmosphere, or any water course, body of water or wetland of any Hazardous Material which exists on, under or at the Project at any time during the term of this Agreement, and from time to time (including, without limitation, any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under the Statutes). For purposes of this Agreement, "Hazardous Material" means and includes any hazardous substance or any pollutant or contaminate defined as such in (or for purposes of) the Comprehensive Environmental; Response, Compensation and Liability Act, any so-called "Superfund" or "Superlien" law, the Toxic Substances Control Act, or any other federal, state or local statute, law, ordinance, code, rule, regulations, order or decree regulating, relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter in effect, or any other hazardous, toxic or dangerous waste, substance or material.

   11.4 SCOPE OF INDEMNITY: Any party's duty to indemnify any other party, as provided for in Section 11 hereof, shall include the obligation to defend the indemnified party in any such action. All costs and expenses of such defense shall be borne by the indemnitor. In the event the indemnitee deems it necessary or expedient to procure legal representation in such proceeding in order to protect the indemnitee's rights therein, all costs and expenses of such defense (including but not limited to reasonable attorney's fees) shall be borne by the indemnitor but only if the indemnitor fails to provide reasonable legal representation. The indemnitor waives for itself and for its insurance carriers any rights of subrogation which the indemnitor's insurance carriers may have against the indemnitees.

   11.5 BONDING: Borror shall cause all personnel who handle or are responsible for the safe keeping of money or other property of Owner and/or Manager to be covered by a fidelity bond, crime or applicable insurance in the minimum amount of Two Hundred Thousand Dollars ($200,000.00) with a company determined by Borror.

   11.6 TERM OF INDEMNIFICATION: The indemnification made by any party to this Agreement, for and on behalf of any other party to this Agreement, for and on behalf of any other party to this Agreement, shall survive the termination of this Agreement.

SECTION 12
INSURANCE

  12.1 INSURANCE BY MANAGER:

    A. Property Insurance: At all times during the term of this Agreement, and at its sole cost and expense, Manager shall or shall cause the Owner to obtain and keep in force for the benefit of Owner and Manager and Borror, property insurance on an "all-risk basis" (open perils), including but not limited to, full coverage for boiler machinery and pressure vessel insurance, vandalism and malicious mischief.

The amount of such insurance shall be 100% of the actual replacement cost of the building and improvements, including the costs of demolition and debris removal, all as reasonably determined by agreement of the Manager and Borror. In obtaining any policies of insurance required hereunder, Manager (or Owner, as the case may be) shall require all insurers to waive any rights of subrogation against Borror.

B.  General Liability Insurance: At all times during the term of this Agreement, and at its sole cost and expense, Manager shall or shall cause Owner to obtain and keep in force for the benefit of Owner, Manager and Borror Commercial General Liability Insurance through one or more primary and/or umbrella liability policies against claims for bodily injury, property damage, advertising injury and personal injury, and such policies shall provide contractual liability coverage as well. The policies shall be written on an occurrence basis with limits of not less than $1,000,000 per occurrence and
$2,000,000 in the aggregate and a $3,000,000 umbrella annually for the term of the Agreement.

C.  Automobile Liability Insurance: At all times during the term of this Agreement, and at its sole cost and expenses, Manager shall or shall cause Owner to obtain and keep in force for the benefit of Manager and Borror Business Automobile Liability Insurance covering all vehicles used in connection with this Agreement, to insure owned non-owned and hired automobiles, trucks and other vehicles. The policy limits shall not be less than $1,000,000 combined single limit and a $3,000,000 umbrella.

D.  Additional Insured and Primacy of Owner's and/or Manager's Insurance: Borror shall be named as an additional insured on all of the above policies for all purposes connected to this Agreement. It is the intent of the parties that the Manager's insurance be primary to any, if any, insurance procured by Borror. Said insurance purchased by Borror shall not contribute in any way. Manager will secure endorsements to this effect from all insurers of such policies.

E.  General Provisions: All insurance shall be written with insurance companies with an A.M. Best's rating of a A:VIII or higher. All liability and auto insurance shall contain a severability of interest clause. All insurance shall provide that notice of default or cancellation shall be sent to Borror as well as Manager and shall require a minimum of thirty (30) days written notice to Borror prior to any cancellation of or changes to said policies. Manager agrees to provide Borror with certificates evidencing such insurance, including the additional insured endorsement, or with duplicate copies of such policies, including all endorsements, within ten (10) days of the execution of this Agreement. If Manager fails to do so, Borror may, but shall not be obligated to, place said insurance and charge the cost thereof to the operating account.

12.2    BORROR'S LIABILITY INSURANCE: Borror at its expense, shall, during the Initial Term and any extended term, maintain and keep in force, the following insurance in the following minimum amounts:

Commercial general liability insurance policy written on an occurrence form basis with limits of $1,000,000 per occurrence and a $2,000,000 aggregate. Such insurance shall include Manager as an additional insured; provided however, such insurance shall be secondary and in excess of Manager's liability insurance required to be maintained by Manager under this Agreement and non-contributory with Manager's policy;

Employer's Liability coverage in jurisdictions where employer's liability insurance is required, with limits of liability of $500,000 or such other higher limits imposed in accordance with the requirement of the Laws of the jurisdictions where the Property is located;

Errors and omissions coverage with a per claim limit of liability of not less than $1,000,000;

Upon request, Borror shall furnish, or cause to be furnished to Manager, certificates of insurance evidencing the foregoing insurance. To the extent permitted by the insurer, Borror's errors and omissions and commercial general liability policies shall not be cancelled without at least thirty (30) days' prior written notice to Manager.

## SECTION 13
## BORROR ASSUMES NO LIABILITY

13.1    Borror assumes no liability whatsoever for any acts or omissions of Owner or Manager or any previous owners of the Project, or any previous property managers or other agents of either Owner, Manager or Borror. Borror assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due Owner or in the performance of any obligations owed by any tenant to Owner pursuant to any rental agreement or otherwise unless solely caused by willful misconduct of Borror. Nor does Borror assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect. Any environmental violations or hazards discovered by Borror shall be brought to the attention of Owner in writing and Owner shall be solely responsible for such violations, hazards or claims arising from such conditions. Further, Borror assumes no liability for the financial performance of the Project. Owner shall be solely liable for all vendor claims and tenant claims, whether made against the Owner, Manager or Borror, for all acts or omissions of Borror within the scope of its agency; provided however, that Borror shall remain liable for the gross negligence or willful misconduct of its employees.

## SECTION 14
## ASSIGNMENT OF RIGHTS AND OBLIGATIONS

14.1    ASSIGNMENT: Borror may, from time to time, assign its rights and obligations under the terms and provision of this Agreement to a subsidiary of Borror, which shall be duly

licensed and otherwise capable of performing the services of Borror under the terms and provisions of this Agreement with the written consent of Manager.

## SECTION 15
## BORROR'S COMPENSATION AND EXPENSES

15.1 COMPENSATION: As compensation for the services provided by Borror under this Agreement (and exclusive of reimbursement of expense to which Borror is entitled hereunder), Manager shall pay Borror the following compensation:

15.2 FOR MANAGEMENT SERVICES: Two and one quarter percent (2.25%) of the total monthly gross receipts from the Project until June 30, 2019, and following June 30, 2019, two percent (2.00%) of the total monthly gross receipts from the Project. Such compensation shall be payable by the first day of the next succeeding month for the monthly gross receipts for the current month. Payments due Borror for periods of less than a calendar month shall be prorated over the number of days for which compensation is due. Management Services is limited to those specific services described in this Agreement. The term "gross receipts" shall be deemed to include all rents and other income and charges from the normal operation of the Project, including, but not limited to, rents, parking fees, net laundry income, forfeited security deposits, forfeited pet deposits, other fees and forfeited deposits, and other miscellaneous income. Gross receipts shall not be deemed to include income arising out of the sale of real property or the settlement of fire or other casualty losses and items of a similar nature; however, any portion of an insurance settlement that provides for loss of rents shall be considered part of gross receipts.

15.3 ACTS OF GOD: In the event of a casualty loss due to Acts of God and/or other insurance claims such as, without limitation, hurricanes, tornadoes, earthquakes, fires or floods, where the Project lender allows restoration of damage to the Project, if Manager engages Borror to oversee such restoration work under a separate written agreement, Manager agrees to reimburse Borror seven percent (7%) of the total cost of the reconstruction project for overseeing the project to completion provided that said fee is reimbursed in its entirety under the provisions of Manager's insurance policy.

15.4 CONSTRUCTION MANAGEMENT SERVICES: Owner and Manager agree that for any construction projects requiring multiple contractors and exceeding a cost of $25,000, Owner and/or Manager shall contract with Borror Construction Company to serve in the capacity of construction manager/general contractor over any such projects, pursuant to a construction services contract in a form and upon such terms and conditions as mutually agreed by the parties.

15.5 FOR OTHER ITEMS OF MUTUAL AGREEMENT: Should Manager wish Borror to perform services which are not otherwise governed by the terms and provisions of this Agreement, the parties shall meet to discuss and to agree upon the additional compensation to be paid by Manager to Borror for such additional services.

15.6 INTEREST ON UNPAID SUMS: Any sums due Borror under any provision of this Agreement, and not paid within thirty (30) days after such sums have become due, shall bear interest at the rate of the lesser of (a) twelve percent (12%) per annum or (b) the maximum rate

permitted by law.

## SECTION 16
## STRUCTURAL CHANGES

16.1    Manager expressly withholds from Borror any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Manager other than expenses related to exercising the express powers vested in Borror through this Agreement, without the prior written consent of Manager. However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal state or local laws, regulations or ordinances, shall be authorized pursuant to section 4.2 of this Agreement, and Borror shall notify Manager appropriately.

## SECTION 17
## BUILDING COMPLIANCE

17.1    Borror does not assume and is given no responsibility for compliance of the Project or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Manager promptly or forward to Manager promptly any complaints, warnings, notices or summons received by Borror relating to such matters. Manager authorizes Borror to disclose the ownership of the Project(s) to any such officials and agrees to indemnify and hold Borror its representative, servants, and employees harmless of and from all loss, cost, expense and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes or regulations.

## SECTION 18
## TERMINATION

18.1    TERMINATION BY OWNER/MANAGER FOR CAUSE: Owner or Manager shall be entitled to terminate this Agreement as set forth in this Section 18.1 prior to the expiration of Term upon the occurrence of the following which shall be deemed "For Cause" for purposes of this Agreement:

>   A.    Default: If Borror defaults in its obligations under this Agreement and such default is not cured within either: (i) ten (10) days written notice by Owner or Manager of any monetary default or (ii) thirty (30) days written notice by Owner or Manager of any non-monetary default; provided, however, that if a non-monetary default is curable and not reasonably subject to cure within the 30-day period, Borror shall have such additional time as may be reasonably required to complete such cure (not to exceed 120 days in the aggregate); provided that Borror commences the cure within the 30-day period and thereafter diligently and continuously prosecutes such cure to completion.

B.

C.  <u>Revenue Threshold</u>: Upon thirty (30) days advance notice by Owner or Manager in the event the Project does not achieve the Revenue Threshold set forth in any annual Plan pursuant to Section 1.6 of this Agreement, and such failure continues for two full (2) fiscal quarters following the date Owner or Manager delivers written notice thereof to Borror.

D.  <u>Misconduct</u>: Immediately upon written notice, if Borror or a principal of Borror commits a felony or other criminal act involving fraud, misappropriation of funds, dishonesty or acts of a similar nature (whether or not such felony or criminal act involves the Project), or misapplies any funds derived from the Project, including security deposits, insurance proceeds or condemnation awards, or commits (by act or omission) any fraud, intentional misrepresentation, or breach of fiduciary duty in connection with Borror's obligations pursuant to this Agreement;

E.  <u>Insolvency</u>: Immediately upon written notice, if Borror files, or there is filed against Borror and not discharged within thirty (30) days, a petition in bankruptcy or reorganization, or Manager makes an assignment for the benefit of creditors or takes advantage of any insolvency law, or Manager dissolves or is liquidated. In order to exercise such termination right, in which event this Agreement shall terminate on the date set forth in the notice of termination of Owner or Manager.

F.  <u>Excessive Damage</u>: Immediately upon written notice, upon the destruction of or substantial damage to the Project by any cause, or the taking of all or a substantial portion of the Project by eminent domain, in either case making it impossible or impracticable to continue operation of the Project.

G.  <u>Sale of Project</u>: In the event of the sale of the Project, this Agreement shall terminate upon the giving of not less than thirty (30) days written notice by Manager to Borror.

18.2 <u>TERMINATION BY BORROR</u>: Following thirty (30) days advance written notice, Borror shall have the right to terminate this Agreement if Owner or Manager default in their respective obligations under this Agreement and such default is not cured within either: (i) ten (10) days written notice by Borror of any monetary default or (ii) thirty (30) days written notice by Borror of any non-monetary default; provided, however, that if a non-monetary default is curable and not reasonably subject to cure within the 30-day period, Owner or Manager shall have such additional time as may be reasonably required to complete such cure (not to exceed 120 days in the aggregate); provided that Owner or Manager commences the cure within the 30-day period and thereafter diligently and continuously prosecutes such cure to completion. In the event this Agreement is terminated by Borror pursuant to this Section 18.2, Borror shall be entitled to any and all accrued amounts then outstanding.

18.3 <u>TERMINATION FOLLOWING INITIAL TERM</u>: Any party may terminate this Agreement upon or following the expiration of the Initial Term by providing no less than thirty

(30) days prior written notice to the other parties.

18.4 OWNER AND/OR MANAGER RESPONSIBLE FOR PAYMENTS: Upon termination of or withdrawal from this Agreement, Owner and/or Manager shall assume the obligations of any contract or outstanding bill executed by Borror under this Agreement for and on behalf of Owner and/or Manager, if such bill was incurred by Borror in accordance with the Plan or as otherwise approved in writing by Manager. In addition, Owner and/or Manager shall indemnify Borror against any obligations or liabilities which Borror may have properly incurred on Owner and/or Manager's behalf under this Agreement.

18.5 ACCOUNTS: UNPAID BILLS: Borror shall deliver to Manager, within forty-five (45) days (or sooner if required by law) after this Agreement is terminated, any balance of moneys due Manager a final accounting reflecting the balance of income and expenses with respect to the Project, as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Project. Bills previously incurred but not yet invoiced shall be the responsibility of and sent directly to Manager.

18.6 FINAL ACCOUNTING: Since all records, contracts, leases, rental agreements, unpaid bills, and other papers and documents which pertain to the Project are deemed to be the property of the Manager, they are to be delivered to Manager, upon the effective date of such termination, after payment of all payroll and fees due Borror. Borror may retain temporary possession of such records as may be necessary in order to comply with the provisions of Section 18.5 and/or state law.

## SECTION 19
## REPRESENTATIONS

19.1 MANAGER'S REPRESENTATIONS AND WARRANTIES: Manager represents to its actual knowledge without inquiry or investigation and warrants as follows: (a) Manager has the full power and authority to enter into this Agreement, and the person executing this Agreement is authorized to do so; (b) there are no written or oral agreements affecting the Project other than the tenant leases or rental agreements, copies of which have been furnished to Borror; (c) all permits for the operation of the Project has been secured and are current; and (d) Manager is not aware of any violation, without research or investigation, of any building or construction statute, ordinance, or regulation, whether federal, state or local, that will affect the operation of the Project; (e) if Manager requests Borror to enter any agreements for the benefit of third parties (i.e. subordination agreement) Manager hereby agrees to fully indemnify Borror for all claims arising from such Agreements.

19.2 BORROR'S REPRESENTATIONS AND WARRANTIES: Borror represents and warrants as follows:

> (a) the officers of Borror have the full power and authority to enter into this Agreement; (b) there are not written or oral agreements by Borror that will be breached by, or agreements in conflict with, Borror's performance under this Agreement; and (c) where necessary, Borror will be duly licensed and able to

perform all of the duties under this Agreement at the effective date of this Agreement and shall comply with and abide by all laws, rules, regulations, and ordinances pertaining thereto.

## SECTION 20
## HEADINGS

All headings and subheadings employed within this Agreement are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

## SECTION 21
## FORCE MAJEURE

Any delays in the performance of any obligation of Borror under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, strikes, labor disputes, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Borror, and any time periods required for performance shall be extended accordingly.

## SECTION 22
## COMPLETE AGREEMENT

This Agreement, including any specified attachments, constitutes the entire agreement between Manager and Borror with respect to the management and operation of the Project and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Manager and Borror relating to the Project covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Manager and Borror. Except as otherwise provided herein, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by Manager and Borror in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, entering into and executing this Agreement has relied upon no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, or as set forth in an exhibit or appendix to this Agreement.

## SECTION 23
## RIGHTS CUMULATIVE: NO WAIVER

No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or

remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

## SECTION 24
## APPLICABLE LAW AND LITIGATION

24.1    INTERPRETATION: The execution, interpretation and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of the location of the Project. If any part of this Agreement shall be declared invalid or unenforceable, Borror shall have the option to terminate this Agreement by notice to Manager.

24.2    DISPUTE RESOLUTION. If either party shall notify the other that any matter is to be determined by arbitration, the parties shall first try to resolve any dispute or controversy arising out of this Agreement. If there is no resolution within thirty (30) days, then (a) within fifteen (15) calendar days thereafter, each party shall appoint an arbitrator by notice to the other party; (b) if either party shall fail to make such appointment within the prescribed time, then the arbitrator appointed by the party not so failing shall appoint, on behalf of the party so failing, one other arbitrator; (c) the arbitrators so appointed shall meet within ten (10) business days and shall, if possible, determine such matter within thirty (30) days after the second arbitrator is appointed, and their decision shall be binding and conclusive on the parties; (d) if the two arbitrators fail to determine said within the 30-day period, they shall appoint a third arbitrator, and in the event of their failure to agree upon such third arbitrator within ten (10) days after the time aforesaid, either party may apply to any court of competent jurisdiction for the appointment of such third arbitrator, and the other party shall not raise question as to the court's power and jurisdiction; and (e) the determination of any two of the three arbitrators shall be given within thirty (30) days (or as soon as is possible) after the appointment of the third arbitrator and shall in all cases be binding and conclusive upon the parties. Each arbitrator shall be sworn to determine fairly and impartially the matter(s) submitted for arbitration. A replacement arbitrator shall be appointed in the same manner as the arbitrator being replaced in cases of death, disqualification, incapacitation or failure/refusal to act. Each party shall pay the fees and expenses of the arbitrator by or on behalf of such party and one-half of the fees and expenses of the third arbitrator, if any. The arbitration shall be conducted pursuant to the American Arbitration Association ("AAA") then-existing rules and regulations and shall be held within fifty (50) miles of the Project, unless otherwise agreed to by the parties.

## SECTION 25
## NOTICES

25.1    Any notices, demands, consents and reports necessary or provided for under this Agreement shall be in writing and shall be addressed as follows, or at such other address as Manager and Borror individually may specify hereafter in writing:

        BORROR:              BORROR PROPERTIES MANAGEMENT, LLC

                        600 Stonehenge Parkway, 2nd Floor
                        Dublin, Ohio 43017

MANAGER:     DSM Group, Inc.
                        11766 Wilshire Blvd., Suite 325
                        Los Angeles, California 90025

OWNER:

Such notice or other communication may be made by email with a receipt confirmation, mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office or via a national overnight carrier. Such notices, demands, consents and reports may also be delivered by hand or by any other receipted method or means permitted by law. For purposes of this Agreement, notices shall be deemed to have been "given" or "delivered" upon personal delivery or receipt in the case of emails.

## SECTION 26
## SPECIAL PROVISIONS

26.1    Client agrees to the following provisions:

## SECTION 27
## CONFIDENTIALITY

27.1    Except to the extent necessary to carry out the obligations hereunder, each party shall treat as confidential and shall not disclose any nonpublic information with respect to the Property, without the prior written consent of the other party. Confidential information does not include information which: (a) is or becomes generally available to the public other than as a result of a disclosure by the receiving party in breach of this Agreement; (b) was available to the receiving party on a non-confidential basis prior to its disclosure by the other party; (c) must be disclosed pursuant to applicable law or regulation or in connection with the pursuit or defense of a claim; (d) is independently developed by the receiving party without the use of confidential information provided by the other party; (e) was available to the receiving party on a non-confidential basis prior to its disclosure by the other party; or (f) becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party, provided that such source is not known to the receiving party to be bound by a confidentiality agreement with the other party or (g) is disclosed at Manager's request.

## SECTION 28
## AGREEMENT BINDING UPON SUCCESSORS AND ASSIGNS

28.1    This Agreement shall be binding upon the parties hereto and their respective personal representatives, heirs, administrators, executors, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

MANAGER:

By: DSM Group, Inc.

By: _____
Bradley H Mindlin

Its: Authorized Agent


Borror Properties Management, LLC

By: _____
Danielle B. Sugarman

Its: Vice President of Apartment Operations


OWNER:

By: ORO KARRIC NORTH, LLC, a Delaware limited liability company

    By: ORO BRC4 LLC, a Delaware limited liability company, its Manager

        By: ORO MANAGER III LLC, a Nevada limited liability company, its Manager

        By: _____
        Bradley H. Mindlin

        Its: Managing Member